UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| JOHNNY DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 08-184-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| UNITED STATES OF AMERICA, | ) | **OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

For more than three years, Plaintiff Johnny Davis has attempted to hold the United States liable under the Federal Tort Claims Act ("FTCA") for the injuries he suffered after cataract surgery while he was an inmate of the United States Penitentiary-Big Sandy ("Big Sandy"). Now he can have his day in court. The Court denies the parties' motions in limine to exclude expert testimony, denies Davis's motion for partial summary judgment on his uveitis/iritis claim, and denies summary judgment for the United States on all but one of Davis's claims.

## BACKGROUND

While incarcerated in November 2004, Johnny Davis asked to see an optometrist because he was having trouble reading. Dr. Tod Diffenbaugh, a Bureau of Prisons optometrist, examined Davis and discovered that he had a cataract in his left eye. Nov. 3, 2004 Patient Exam. Form, R. 120-2. A cataract—clouding of the eye's lens—is serious business, so Dr. Diffenbaugh referred Davis to Dr. Russell Fry, an ophthalmologist in Huntington, West Virginia. Dr. Fry confirmed Diffenbaugh's diagnosis. Jan. 12, 2005

Exam. Form, R. 120-3.  Both Dr. Diffenbaugh and Dr. Fry recommended surgery to remove the cataract, and Big Sandy's health care review committee agreed.  Ramirez Dep., R. 116-1 at 26-28.

On June 27, 2005, Big Sandy staff transported Davis to St. Mary's Medical Center in Huntington where Dr. Fry performed cataract surgery.  Operative Rep., R. 120-4.  As part of the surgery, Dr. Fry removed the natural crystalline lens of Davis's left eye and replaced it with a clear plastic intraocular lens.  The surgery was successful and had no immediate complications.  *Id.*  Afterward, Dr. Fry instructed Davis to sleep only on his side or back, not to rub or put pressure on his left eye, to take Tylenol every four hours if his eyes hurt, and to remain under the supervision of a responsible adult for twenty-four hours.  Instructions, R. 120-5.

Those instructions may be easy for most patients to follow in the comfort of their homes, but they proved more difficult for a Big Sandy prisoner.  On his first night back at Big Sandy, Davis was placed in the prison's Special Housing Unit so he would be under the guards' twenty-four-hour watch.  1 Davis Dep., R. 106-1 at 60.  Davis claims that while in his cell, he suffered from extreme pain and the guards refused to give him the Tylenol he requested.  Even worse, when trying to summon medical help, Davis claims that he became dizzy, fell over, and knocked himself unconscious.  *Id.* at 64-65.  The next day, Dr. Fry examined Davis and found that his intraocular lens was displaced.  June 28, 2005 Exam. Form, R. 120-6.  A displaced intraocular lens is a rare, but known, complication of cataract surgery that can cause blurry vision and glare.  Despite finding the displaced lens, Dr. Fry did not order any follow-up surgical procedures.  June 28, 2005 Exam. Form, R. 120-6.

2

After Dr. Fry's examination, Davis began complaining of pain to Big Sandy staff.  On June 29, he told a Big Sandy official that he still had "severe eye pain" and "blurred vision." 2 Davis Dep., R. 107-1 at 131-32.  Two days later, on July 1, Big Sandy physician assistant Samiran Bhadra examined Davis.  Bhadra noted that Davis had "pain and watering from the left eye" and that Davis rated his pain as a six on a ten-point scale.  R. 120-8.  Dr. Steven Conrotto reviewed Bhadra's note later that day and recommended that Davis continue taking the steroid Prednisone for his eye.  *Id.*

Between July 1 and July 12, 2005, Davis repeatedly complained to Big Sandy Health Services Administrators Francisca Terrero-Liebel and Ulises Vargas about the pain in his eye.  2 Davis Dep., R. 107-1 at 139, 142-43.  But Davis did not see a medical professional again until July 13, 2005, when Dr. Diffenbaugh examined him.  Dr. Diffenbaugh found that Davis had a displaced intraocular lens, an iris bombe, and an intraocular pressure of twenty-five millimeters.  Jul. 13, 2005 Patient Exam. Form, R. 120-9.  At twenty-five millimeters, Davis's intraocular pressure was already four points over normal, and the iris bombe meant that Davis's iris was bulging toward his cornea—another condition that can raise intraocular pressure.  Kitchens Rep., R. 117-1 at 3.  Dr. Diffenbaugh also noticed that although Dr. Fry had prescribed steroids for Davis, Dr. Fry had not conducted any follow-up.  R. 45, Attach C.  To Dr. Diffenbaugh, the combination of a displaced lens, abnormally high pressure, and steroids was serious: he recommended Davis see a specialist "ASAP."  *Id.*

The next day, Big Sandy transported Davis back to Huntington to see Dr. Fry again, and Dr. Fry decided to perform a second surgery.  Jul. 14, 2005 Patient Exam. Form, R. 120-12.  On July 27, 2005, Dr. Fry performed an anterior vitrectomy, which aimed to remove

3

some of the clear internal jelly (known as "vitreous humor") from the front of Davis's eye. Operative Report, R. 120-14.

But this second surgery did not solve the problem.  On August 17, 2005, Dr. Diffenbaugh examined Davis again and recommended that he see a different doctor, preferably one at the University of Kentucky.  R. 45, Attach. F.  The next day, Dr. Fry saw Davis again and diagnosed him with severe iritis.  Patient Exam. Form, R. 120-15.

Over the next fourteen months, Davis repeatedly saw Dr. Diffenbaugh and was transported to the University of Kentucky twice to see ophthalmologists and glaucoma specialists.  *See* Kitchens Dep. R. 117-1 at 5-8 (summarizing treatment).  Then, at an examination on October 18, 2006, Dr. Diffenbaugh told Davis that his chronic eye problems stemmed from the "delay in limited follow-up treatment" after his first surgery.  R. 125-5.  In November 2006, Davis was transferred from Big Sandy to a federal prison in South Carolina.

Even after the additional care, Davis's eye remained injured.  Suffering from chronic eye pain, excessive tearing, blurred vision, headaches, and extreme sensitivity to light, Compl., R. 2 ¶ W, he filed an administrative claim with the Bureau of Prisons on January 14, 2008.  Prison officials denied that claim on March 5, 2008, so Davis filed a pro se complaint on September 2, 2008.  R. 2.  Davis alleges that the United States was negligent in providing him care after his first cataract surgery.  Specifically, he claims: (1) Big Sandy officers refused to give him painkillers and monitor him on the night of June 27 when he was in the prison's Special Housing Unit; (2) Big Sandy medical staff inadequately responded to his complaints of pain and blurred vision between July 1 and July 13, causing him to develop

chronic uveitis/iritis;[1] and (3) as a result of his inadequate post-operative care, he will eventually develop glaucoma.  R. 120-1 at 3 & n.1.

Five motions are now before the Court.  The United States has filed three separate motions for summary judgment: one arguing that the FTCA's two-year statute of limitations bars the Court from considering Davis's claims, R. 111-1;[2] another arguing that Davis has not offered any competent expert witnesses and therefore cannot prove negligence, R. 118-1; and a third arguing that Davis cannot prove negligence related to his treatment on the night of June 27 after his surgery, R. 119-1.  For his part, Davis has filed a motion for summary judgment on his uveitis/iritis claims, R. 120, as well as a motion in limine to exclude certain testimony by the expert for the United States, Dr. John Kitchens, R. 121.

## DISCUSSION

### I.      Statute of Limitations

Like many causes of action, FTCA claims have an expiration date.  Plaintiffs may only sue the federal government for tort claims they bring "within two years after such claim accrues."  28 U.S.C. § 2401(b).  But when a claim accrues is somewhat tricky.  The statute of limitations for an FTCA claim begins to run when the plaintiff knows of both the existence

---

[1] Davis's expert, Dr. Keith Stolte, explains that uveitis and iritis are interchangeable terms because they are "essentially the same disease.  It is an inflammatory condition of the uvea.  And usually it's a breakdown of the blood aqueos barrier leaking protein into the anterior chamber."  Stolte Dep., R. 109 at 101.

[2] Courts are divided on whether the FTCA's statute of limitations is jurisdictional.  *Compare Adams v. United* States, 658 F.3d 928, 933 (9th Cir. 2011) (jurisdictional) *with Santos ex rel. Beato v. United States*, 559 F.3d 189, 195-96 (3d Cir. 2009) (procedural rather than jurisdictional).  This question would be pertinent if the Court were to apply the doctrine of equitable tolling to preserve Davis's claim.  R. 125 at 8.  But because the statute of limitations did not expire in this case, the Court need not enter the jurisdictional versus procedural debate.

and cause of his injury. *See United States v. Kubrick*, 444 U.S. 111, 121-23 (1979). Knowing the cause of an injury means knowing "facts that would lead a reasonable person (a) to conclude that there was a causal connection between the treatment and the injury or (b) to seek professional advice, and then, with that advice, to conclude that there was a causal connection between the treatment and the injury." *Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir. 1983); *see also Kubrick*, 444 U.S. at 122 ("That [a plaintiff] has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain.").   For this inquiry, the United States bears the burden of proving that the statute of limitations has expired. *Hogan v. United States*, 42 F. App'x 717, 722 (6th Cir. 2002).

In its previous Memorandum Opinion and Order, R. 16, the Court held that Davis's claim began to accrue on October 18, 2006, because that was the first time Big Sandy medical staff told Davis his injuries were "due to a delay in initial follow-up treatment." R. 2, Exh. F.  Between July 2005 and October 2006, Davis knew his eye still had problems, and he sought medical treatment.  But realizing that his eye required further attention did not "necessarily [mean] that he had knowledge of the cause of his injuries—especially since the medical records prior to October 18, 2006 recount these other facts but not the cause of his injury."  R. 16 at 6 (citing R. 11, Exh. H-L).

Since that opinion, discovery has turned up more of Davis's medical records.  On September 5, 2005, Davis filled out a request to staff form (in prison parlance, a "cop-out"), asking to see an ophthalmologist because he was in "intense pain" and was "hoping that the

necessary steps are taken to get me prompt and proper medical attention to correct the malpractice I have suffered before any further damage is done by denying me proper medical attention." R. 107-5. The United States' motion is not crystal clear, but it appears to argue first that the form is conclusive evidence that Davis realized Big Sandy's post-operative care caused his injuries, R. 111-1 at 7-8, and second that the form shows Davis was aware of "a potential existence of government causation," R. 135 at 4. Under either theory, the United States believes Davis triggered the statute of limitations two years and five months before he filed his administrative claim.

Might Davis have suspected something was amiss about his treatment in September 2005? He did, after all, use the word "malpractice" on the cop-out form. Yet suspicion of poor current medical treatment does not necessarily lead to the understanding that past actions caused an injury. *See, e.g.*, *Coffie v. United States*, 43 F. App'x 808, 812 (6th Cir. 2004) (holding that a plaintiff who was in pain because of a government doctor's negligence did not "become cognizant of the full extent of her injury and its cause" until her private physician informed her that the government doctor was responsible). A hypothetical scenario may help illustrate this point. If a doctor performs surgery on an inmate and leaves a scalpel inside his stomach, the doctor has surely committed malpractice but the inmate does not yet know it. The inmate is in pain, so he asks the prison pharmacy for painkillers—only to be told to come back the next day. Outraged that he must suffer, the inmate complains to the prison administration, saying it was "malpractice" for the pharmacy to deny him drugs. The inmate has alleged malpractice, but he does not know the doctor's negligence caused his injuries, so his claim has not accrued.

Davis faced a similar predicament. As an inmate in a high-security federal prison, he may have had reasons independent from delayed post-operative care to gripe about his medical treatment. When counsel for the United States asked what he meant by writing "malpractice," Davis explained that "I was injured, and I was wearing dark shades, and my eye was hurting, and I was in pain. And I wanted help. I wanted medical attention." R. 107 at 121. These are the words of a man asking for treatment, not alleging past negligence. On the cop-out itself, Davis specifically says that his "medication is not helping with [his] intense pain." R. 107-5. In this context, he might have used "malpractice" to mean that he was receiving the wrong pain medication, the right medication in the wrong dosage or at the wrong times, or that it was malpractice for Big Sandy's staff not to allow him to see medical staff more frequently. *See, e.g.*, Davis Dep. R. 107-1 at 155 ("I started going to main line . . . to see whoever medical staff because there was no way to keep going . . . to health services. You're not allowed to just walk there."). Nowhere does he evince a belief that a two-week delay in his post-operative care constituted "malpractice." The Court cannot speculate otherwise.

A plaintiff's awareness of a "potential existence of government causation," R. 135 at 3, also does not trigger the statute of limitations. *Kubrick* recognized that a plaintiff must be or should be aware of "probable" government causation, not merely a possibility that the government caused an injury. 444 U.S. at 118. Under the standard of potential causation that the United States proposes, prisoners would be required to file FTCA claims at the first hint of government-caused injury, even if many claims were ultimately frivolous. Surely this is not the standard the United States desires or the one that *Kubrick* endorses.

8

Davis might also have reasonably believed that pain was a predictable side effect of his two eye surgeries.  Big Sandy doctors and nurses examined Davis numerous times after his June 27, 2005, surgery, and Dr. Fry even performed another surgery.  But no one told Davis what caused his injuries, and Davis did not yet have access to his medical records. "[W]hen a physician misinforms the patient that complications are not unusual occurrences and will improve, the statute of limitations is not activated." *McDonald v. United States*, 843 F.2d 247, 248 (6th Cir. 1988) (citation omitted).  Before October 2006, Davis could have only speculated that his injuries were caused by delayed post-operative care, and speculation is not enough to trigger the statute of limitations clock.  *See Arroyo v. United States*, 656 F.3d 663, 672 (7th Cir. 2011) ("[I]njuries can have multiple causes and a plaintiff's claim only accrues when he obtains sufficient knowledge of the government-related cause of his injury.").

Finally, the United States bears the burden of showing the statute of limitations has expired.  *Hogan*, 42 F. App'x at 722.  Davis's use of the word "malpractice" on the September 2005 cop-out is simply too ambiguous for the United States to satisfy that burden. The United States also appears to argue elsewhere that there may have been several different sources of Davis's eye injuries, including the initial surgery by Dr. Fry.  *See* R. 126 at 4.  If the United States believes Dr. Fry could have caused Davis's injuries, perhaps Davis did as well when he wrote the cop-out.  To a layman like Davis, Dr. Fry might be the most logical source of his injuries: he had surgery, his eye hurt, and he wanted someone to do something about the "malpractice" he suffered.  Without better evidence, the Court cannot guess whether Davis believed the government caused his injuries in September 2005.  As a result,

9

the Court reaffirms its previous holding: when Dr. Diffenbaugh told Davis that his eye problems stemmed from a delay in post-operative treatment, his claim accrued.  *See* Memo. Op. & Order, R. 16 at 8.  The statute of limitations does not bar this suit.

## II.   Expert Testimony

Next, the United States argues that the Court should not allow Davis's two expert witnesses, Dr. Tod Diffenbaugh and Dr. Keith Stolte, to testify as experts.  *See* R. 118 (citing Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).

A court should only admit relevant expert testimony if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  This rule requires district courts to play a "'gatekeeping role' in screening the reliability of expert testimony."  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 668 (6th Cir. 2010) (quoting *Daubert*, 509 U.S. at 597).  But FTCA suits are bench trials, *see* 28 U.S.C. § 2402, and the "gatekeeper doctrine" was "designed to protect juries."  *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004).  As a result, the doctrine "is largely irrelevant in [this] context."  *Id.*; *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony" and "[t]hat interest is not implicated . . . where the judge is the decision maker"); *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) (noting that the "usual concerns" about shielding the jury from unreliable expert testimony "obviously do not arise" in a bench trial).

10

The Court must also take into account that this litigation is still at the summary judgment stage. "[I]n all but the most clear cut cases," it will be difficult for a court to adequately gauge the reliability of an expert's testimony based on the "truncated record" available at summary judgment. *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997); *see also Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000) ("A district court should not make a *Daubert* ruling prematurely, but should only do so when the record is complete enough to measure the proffered testimony against the proper standards of reliability and relevance."). The Court could, of course, hold a *Daubert* hearing before trial. But that would be an unnecessary use of the parties' resources. There is no jury to protect from unreliable testimony, and as a result, the Court has "substantial flexibility" in when to conduct its *Daubert* analysis. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000) (Gilman, J., dissenting). The Court will therefore conduct a preliminary review of the parties' motions in limine, and the parties may renew at trial any *Daubert* motions the Court denies today.

### A.      Dr. Tod Diffenbaugh

The United States first challenges the testimony of Dr. Tod Diffenbaugh on the grounds that Dr. Diffenbaugh is a doctor of optometry, not an ophthalmologist. Specifically, the United States argues that Dr. Diffenbaugh is "not qualified to render opinions concerning complications of cataract surgery because he is not a surgeon." R. 118-1 at 9. But this argument misstates Rule 702 and the *Daubert* standard.

An expert witness must have the "knowledge, skill, experience, training, or education" necessary to form an opinion, Fed. R. Evid. 702, but nothing in the Rules of

11

Evidence requires a witness to have a medical degree in order to serve as a medical expert. In fact, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." Fed. R. Evid. 702 advisory committee's note (2000 amends.). Just as an accountant might be an expert on tax law or a mechanic might be an expert on automobiles, so too might an optometrist be an expert on certain areas of eye care. So long as expert testimony is supported by relevant experience, it is admissible under Rule 702 and *Daubert*. *See, e.g.*, *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn., P.C.*, 388 F.3d 976, 978-79 (6th Cir. 2004) (holding that a district court abused its discretion by excluding testimony from a cardiac surgeon on whether a pulmonolgist had removed a breathing tube too early after surgery); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

As a licensed optometrist, Dr. Diffenbaugh *may* be qualified to give expert testimony on the standard of care for patients who have recently received cataract surgery. Dr. Diffenbaugh studied ocular anatomy and eye diseases for four years of optometry school, Diffenbaugh Dep., R. 108 at 184, and he has practiced as an optometrist for seventeen years, *id.* at 14. In his private practice, Diffenbaugh treats eye infections and glaucoma, *id.* at 19, and he testified that his responsibilities include managing the care of patients who have recently had cataract surgery. *Id.* at 28-29. But Dr. Diffenbaugh not only treats cataract patients in his private practice; the United States hired him to treat *Johnny Davis* after his surgery. If the United States believed Dr. Diffenbaugh was sufficiently qualified to treat Davis after cataract surgery in 2005, why does the United States believe that he is not

12

qualified to testify about that care today?  At trial, Dr. Diffenbaugh may testify, and the United States may renew its motion after its voir dire.

### B.    Dr. Keith Stolte

The United States also seeks to exclude the testimony of Dr. Keith Stolte, a board-certified ophthalmologist whom the Bureau of Prisons hired to care for Davis in 2009. R. 118.  In its motion, the United States argues that Dr. Stolte's expert opinion is not built on sufficient facts, fails to offer any reasoning or methodology to explain how it reaches its conclusions, and is irrelevant.  *Id.* at 13.  But based on the information now before the Court, the United States is mistaken on all three assertions.

### (a) Factual Support

First, Dr. Stolte's report is based on sufficient factual support.  Dr. Stolte testified that he reviewed Davis's medical records before drafting his report.  Stolte Rep., R. 109-21 at 1; Stolte Dep. R. 109 at 13-14.  Those records only reflect the medical care that Big Sandy provided Davis; they reveal nothing about periods of time when Davis received no treatment. As a result, Dr. Stolte could not reach a conclusion about the condition of Davis's eye between July 1 and July 13, 2005, when Big Sandy medical staff did not examine him.  But "mere weaknesses in the factual basis of an expert witness's opinion bear on the weight of the evidence rather than on its admissibility."  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000).  For example, Dr. Stolte wrote in his report that "[d]uring Mr. Davis's first post op visit at Dr. Diffenbaugh's office I did not find a post operative intraocular pressure. . . .  We can only imagine what his intraocular pressure was [from July 1, 2005 to July 13, 2005] as I have seen these pressures as high as 50 mm."  Stolte Rep.,

R. 109-21 at 2.  The United States argues that these assertions "have no factual support in the record and are merely [Stolte's] speculations and conjectures."  R. 118-1 at 11.  But Dr. Stolte's statements are not divorced from the record.  On the contrary, they reflect gaps that exist because Davis did not receive medical treatment over that twelve-day period—the very omission that, according to Davis, caused his injury.  Dr. Stolte surely would have been speculating had he concluded Davis had an intraocular pressure of fifty millimeters.  Instead, Dr. Stolte concluded that Davis "probably" had an elevated intraocular pressure between July 1 and July 13.  The knowledge that Davis had an above-average pressure on July 1 and was taking steroid eye drops—which can increase pressure, *see* Stolte Rep. R. 109-21 at 2—was a sufficient factual foundation for Dr. Stolte to reach this conclusion.  Dr. Stolte's opinions are therefore based on the factual record of the case rather than pure speculation.

If Dr. Stolte engages in speculation at trial, the United States may object to specific testimony at that time.  But to the extent Dr. Stolte reached opinions based on incomplete medical records, the Court will discount the weight of his testimony, not declare it inadmissible.

### (b) Reliability

Second, Dr. Stolte provided adequate explanations for how he reached his conclusions.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i).  In both his initial and supplemental reports, Dr. Stolte explains that he based his findings on a 2009 examination of Davis and a review of Davis's medical records.  After this review, Dr. Stolte concluded that Davis's complaints of pain after surgery were a sign of "potentially significant problems."  Stolte Rep., R. 109-21 at 1.  Dr. Stolte then detailed what the Big Sandy medical staff should have done to satisfy

14

the standard of care: monitored Davis carefully and sent him back to Dr. Fry or a qualified prison physician.  *See, e.g.*, *id*. at 1-2.  Moreover, Dr. Stolte noted that since Davis had "a retained cortex and a displaced [intraocular lens]," the prison "should have addressed Mr. Davis's complaint immediately."  Instead, Dr. Stolte says that "USP Big Sandy did nothing for twelve days, which caused significant pain, suffering, and long-term complications."  *Id*. at 1-2.  In his supplemental report, Dr. Stolte further outlines precisely what steps Big Sandy medical staff should have taken in order to satisfy the standard of care for Davis's post-operative treatment.  *See* R. 130-3.  Moreover, Dr. Stolte expounded at length on all of these conclusions in his deposition.  *See* Stolte Dep., R. 109-1 at 99-123.  Dr. Stolte has described his sources of information, how he used those sources, and what conclusions he reached.  His report is sufficient to serve as "a complete statement of all opinions [he] will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).

But Rule 26 is not the only requirement Dr. Stolte's testimony must satisfy: the United States also quarrels with how Dr. Stolte concluded that the delay in Davis's post-operative treatment caused his chronic iritis.  R. 118 at 13.  In order to satisfy *Daubert*, a medical opinion about causation must: (1) ascertain the nature of the injury; (2) "rule in" one or more causes of the injury through a "valid methodology"; and (3) use "standard diagnostic techniques by which doctors normally rule out alternative causes" to reach a conclusion as to which cause is most likely.  *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 760, 762 (3d Cir. 1994)).

Based on a preliminary review of his reports and deposition testimony, the Court finds that Dr. Stolte's conclusions about the cause of Davis's iritis meet these requirements.

15

From reviewing Davis's medical records and conducting an in-person examination in 2009, Dr. Stolte knew that Davis had chronic iritis. *See* Stolte Dep., R. 109-1 at 81-84. Indeed, the government's expert, Dr. John Kitchens, concurred in this diagnosis. *See* Kitchens Suppl. Rep., R. 121-3 at 2-3. By reviewing those same records, Dr. Stolte concluded that a retained cortex was the most likely cause of the chronic iritis. R. 130-3 at 3. He explains that he ruled in the retained cortex as a cause because the cortex is not recognized by the body's immune system. *Id.* The immune system therefore treats the cortex as a foreign protein or antigen, triggering an immune response like iritis. *Id.* He also points out that Davis's undiagnosed vitreous wick—which is when a small piece of the eye's internal jelly becomes trapped in an open wound—would have compounded the immune response. R. 109-1 at 104-05, 117. Dr. Stolte then noted that "[i]ritis and uveitis are immune diseases," and "if the cortex was addressed in a more timely fashion on [July 1, 2005], Mr. Davis would not be in his present condition." R. 130-3 at 3; *see also* Stolte Dep., R. 109-1 at 111-12 (summarizing his theory of how the delay in post-operative treatment caused iritis). In his deposition, Dr. Stolte also explained that he ruled out the possibility that Davis had iritis prior to his cataract surgery because pre-surgery blood tests showed normal results. R. 109-1 at 103, 114.

Dr. Stolte therefore used a differential diagnosis—the "standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated"—to reach his conclusion. *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001). This methodology may not have been perfect. For instance, it is less clear whether Dr. Stolte considered some of the other possible causes of iritis that Dr. Kitchens identified in his supplemental report. *See* R. 121 at 2. But there is no jury in this

16

case to protect from unreliable testimony, so the Court will deny the United States' motion to exclude Dr. Stolte's testimony without prejudice.   At trial, the Court will have the opportunity to hear in-person testimony from Dr. Stolte, and the United States may renew its *Daubert* motion if it still believes his testimony is unreliable.

One final note on reliability.   In its motion, the United States makes sweeping assertions about the unreliability of Dr. Stolte's testimony.   *See, e.g.*, R. 118 at 13 ("In all aspects, Dr. Stolte's initial report . . . is inadmissible under FRE 702 and *Daubert*"); R. 135 at 9 ("Stolte's report does not offer any reasoning or methodology . . . .").   If the United States renews its *Daubert* motion at trial, it should identify specific unreliable findings by Dr. Stolte and explain why each finding does not meet the requirements of *Daubert* and Rule 702.

### (c) Relevance

Third, Dr. Stolte's testimony is relevant.   Dr. Stolte's reports bear directly on Davis's claims that Big Sandy officials breached a duty of care to Davis and whether their actions caused his chronic uveitis/iritis and glaucoma.   Indeed, the United States appears to concede as much.   *See* R. 118 at 10 (listing Dr. Stolte's opinions of the ways Big Sandy behaved negligently).

### (d) Late Disclosures

Lastly, the United States also seeks to exclude Dr. Stolte's supplemental report under Rule 26(e) because it "offers nothing new that was not available . . . when he prepared his initial report."   R. 118 at 13.   Dr. Stolte submitted his initial report on July 29, 2011, and his supplemental report on November 10, 2011.   R. 109-21; R. 130-3.   Davis, for his part, argues

17

that Dr. Stolte only supplemented his report based on newly discovered evidence.  R. 130 at 11-13.  In particular, Dr. Stolte claims to have supplemented his report in response to (1) evidence showing that Big Sandy physician assistant Samiran Bahdra examined Davis on July 1, 2005; (2) the disclosure that Dr. Steven Conrotto was an employee of the Bureau of Prisons; and (3) photographs of Davis's eye in 2009 that Dr. Stolte was only able to recover in October 2011.  R. 130 at 12-13.

### (1) The Bhadra Examination

A review of the record shows that when he wrote his initial report, Dr. Stolte had access to the notes from Bhadra's examination of Davis on July 1, 2005.  Davis himself filed Bhadra's notes of the July 1 examination into the public record of the case on February 22, 2010.  *See* R. 48-5, Exh. E.  Dr. Stolte therefore should have included his conclusions about this examination in his initial report.

But Dr. Stolte's failure to include these conclusions does not necessarily mean the Court should exclude his testimony.   Under Rule 37(c), a party that fails to meet the requirements of Rule 26(a) for disclosing expert reports is prohibited from using the undisclosed information at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *United States v. Rapanos*, 376 F.3d 629, 644-645 (6th Cir. 2004), *vacated on other grounds*, 547 U.S. 715 (2006).

In this case, Dr. Stolte's failure to disclose has not harmed the United States.  The expert for the United States, Dr. John Kitchens, was aware of Dr. Stolte's opinions about the July 1 examination when Dr. Kitchens composed his supplemental report.  Dr. Kitchens filed an initial report on August 25, 2011, and supplemented his report on November 9, 2011.  *See*

R. 117-1; R. 121-3.   His supplemental report was based on, among other things, the September 1, 2011, deposition of Dr. Stolte.  R. 121-3 at 1.  In that deposition, Dr. Stolte reviewed the record of Bhadra's July 1 examination and concluded that Davis's post-surgery pain was "troublesome" and should have caused Big Sandy officials to "immediately" contact Dr. Fry.  Stolte Dep., R. 109-1 at 95-97.  This conclusion was identical to the one Dr. Stolte reached in his supplemental report.  *See* R. 130-3 at 2.  As a result, Dr. Stolte's failure to disclose was harmless.  *Cf. Rapanos*, 376 F.3d at 645 (6th Cir. 2004) ("In this case, the failure to disclose seems harmless as the Defendants were aware of the data used in the supplemental reports.").  Dr. Stolte may therefore testify to his conclusions about the July 1 examination at trial.

(2) and (3) Dr. Conrotto and the 2009 Photographs

Similarly, Dr. Stolte may also testify about the other conclusions in his supplemental report.  Two days before the supplemental report deadline, the United States informed Davis that Dr. Steven Conrotto had been a Bureau of Prisons employee, rather than an independent contractor, in July 2005.  *See* R. 102.  Dr. Stolte therefore included opinions about Conrotto's actions in his supplemental report.  *See* R. 130-3 at 2-3.  His other additions—opinions about Davis's glaucoma—were based on photographs that were not available until October 2011. When Davis obtained these photographs, he promptly provided them to the United States. Because these supplementations were based on newly discovered evidence, they do not violate Rule 26(e) and Dr. Stolte can testify about them at trial.

19

### C.    Dr. John Kitchens

Davis has also filed a motion in limine, R. 121, to exclude (1) testimony from Dr. John Kitchens, the expert for the United States, that Dr. Fry, the cataract surgeon, is responsible for the damage to Davis's eye; and (2) portions of Dr. Kitchens's supplemental report dealing with the causes of Davis's chronic iritis.  *Id.*   Based on his reports, Dr. Kitchens may not testify as to whether Dr. Fry breached a duty of care to Davis, but he can testify about the possible causes of Davis's iritis.

In his initial and supplemental reports, Dr. Kitchens did not offer any opinions about whether Dr. Fry breached a duty of care to Davis.  Even if Dr. Kitchens had opined to that effect, his testimony would not be relevant: Fry was an independent contractor hired by the Bureau of Prisons to perform cataract surgery on Davis, but he is not a defendant in this case and the United States is not liable for his actions.  *See* Mem. Op. & Order, R. 16 at 9-10; 28 U.S.C. § 2671; *United States v. Orleans*, 425 U.S. 807, 814 (1976).  Any testimony from Dr. Kitchens—indeed, testimony from any witness—on whether Dr. Fry breached a duty of care is irrelevant to this case and inadmissible at trial.

Causation, on the other hand, is a different story.  Davis asserts that Big Sandy's inadequate post-operative care caused his iritis, so other possible causes of his iritis are clearly relevant.  Dr. Kitchens did not include his opinions about iritis causation in his initial report, but the United States argues that Rule 26(e) permitted him to add the opinions to his supplemental report because Davis changed his damages theory between the two reports.  Regardless of whether Davis "radically modified his theory of damages," R. 126 at 2, any Rule 26 violation by Dr. Kitchens was harmless.  Dr. Kitchens explained his theories of iritis

causation in his deposition on October 26, 2011. *See* Kitchens Dep., R. 117 at 33-36. Davis's expert, Dr. Stolte, had the opportunity to review Dr. Kitchens's deposition before filing his supplemental report on November 10, 2011. In fact, in his supplemental report, Dr. Stolte addresses a question raised for the first time in Kitchens's deposition. *See* R. 130-3 ("In regards to Dr. Kitchen's [sic] deposition, Page 15, Question 15."). Because any failure to disclose by Kitchens was harmless, he may also testify on iritis causation.

## III.   Summary Judgment

### A.   Motions by the United States: R. 118 and R. 119

The United States moves for summary judgment on Davis's claim that Big Sandy officials provided him with negligent care after his return from surgery on June 27, 2005, because Davis has not offered an expert witness in support of this claim. R. 119-1. Davis agrees that he will not offer any expert testimony to prove that Big Sandy officials' actions on that day caused his injuries, and does not oppose the motion. R. 127. FTCA actions are governed by the tort law of the state where the events occurred that led to the plaintiff's injury, *United States v. Olson*, 546 U.S. 43, 46 (2005), so Kentucky negligence law controls. Kentucky requires a plaintiff to establish "duty, breach, causation, and damages," *Boland-Maloney Lumber Co. v. Burnett*, 302 S.W.3d 680, 686 (Ky. Ct. App. 2009), and establishing causation requires expert testimony, *see Jahn*, 233 F.3d at 388. Because Davis will not offer an expert witness to prove causation, he cannot establish negligence on this claim and the United States is entitled to summary judgment.

On the other hand, the United States's motion for partial summary judgment on Davis's other claims, R. 118, must fail for the same reason. In its motion to exclude the

21

testimony of Dr. Diffenbaugh and Dr. Stolte, the United States also moved for summary judgment on the theory that without the two doctors' testimony, Davis failed to present any expert testimony to prove causation.  Because Dr. Diffenbaugh and Dr. Stolte may testify at trial, the United States is not entitled to summary judgment.  Of course, if the Court excludes these witnesses at trial on *Daubert* grounds, the United States may move for a directed verdict.

### B.    Motion by Davis: R. 120

The last motion before the Court is Davis's motion for summary judgment on his uveitis/iritis claims.   Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  But here, too many material facts remain in dispute for the uveitis/iritis claim to be "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

One example suffices to prove this point.  Davis claims that the expert for the United States, Dr. Kitchens, gave away the store by admitting that there was "an over 50 percent chance" that the retained cortex in Davis's left eye caused his chronic iritis.  Kitchens Dep., R. 117 at 36.  In response, the United States argues that Dr. Kitchens was only referring to the iritis that Davis had on August 18, 2005, not his chronic iritis.  R. 131 at 33.  Dr. Kitchens himself filed a declaration to the same effect. *See* R. 131-5 ¶ 12 ("Plaintiff attempts to take out of context my deposition testimony as to whether the retained cortex 'likely'

caused his iritis. . . .   My testimony was directed solely to medical records as of the August 18, 2005 note, not to Mr. Davis' entire medical history related to the treatment of his eyes.").

A straightforward reading of Dr. Kitchens's deposition affirms this version of his testimony:

> MR. BRICKMAN:    You testified that it's possible that the severe iritis that was noted by Dr. Fry on August 18th, 2005 was caused by the retained cortex?
>
> DR. KITCHENS:    It's possible.
>
> MR. BRICKMAN:    And you noted it was possible that it was also caused by the displaced [intraocular lens], correct?
>
> DR. KITCHENS:    It's possible.
>
> MR. BRICKMAN:    Now I'm asking you, was it likely that it was caused by the retained cortex?
>
> DR. KITCHENS:    I don't know that I can really answer that, you know, because there's three possibilities of what it can be caused from.  When you say is it likely, are you talking about an over 50 percent chance?
>
> MR. BRICKMAN:    Yeah.
>
> DR. KITCHENS:    Okay.  So I would say, yes, it's likely, an over 50 percent chance.

Kitchens Dep., R. 117 at 35-36.  This line of questioning clearly related to the iritis that Davis suffered on August 18, 2005, not the chronic iritis for which Davis seeks summary judgment.  Davis's lawyer introduced the questions about possible causes of iritis by referencing the August 18th note by Dr. Fry.  Absent clarification to the contrary, Dr. Kitchens could have reasonably believed that subsequent questions also related to Davis's medical condition on August 18, 2005.  Perhaps a single bout of iritis and chronic iritis are related, and iritis on one day in 2005 necessarily means chronic iritis in the future.  But Davis

23

has not introduced evidence to this effect, and the Court cannot extrapolate this conclusion on its own.  A genuine issue of material fact exists on causation, so summary judgment is inappropriate.

The parties also dispute many other material facts relating to the other elements of Davis's uveitis/iritis claim.  In its response, R. 131 at 20-27, the United States denies the facts Davis alleges in paragraphs 11, 13, 19, 20, 21, 29, 36, 38, 39, 45, 53, 57, 58, 59, 60, 61, 63, 64, 65, 68, 69, 70, and 72, and many of these paragraphs relate to the duty and breach elements of Davis's uveitis/iritis claim.  The Court can only resolve these disputes at trial.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** as follows:

(1)     The motion by the United States for summary judgment on statute of limitations grounds, R. 111, is **DENIED**.

(2)     The motion in limine by the United States to exclude the testimony of Dr. Tod Diffenbaugh and Dr. Keith Stolte, R. 118, is **DENIED WITHOUT PREJUDICE**.  The United States may renew its motion at trial if it believes the testimony of either witness does not comply with the requirements of Federal Rule of Evidence 702 and *Daubert*.

(3)     The motion in limine by Davis to exclude certain testimony by Dr. John Kitchens, R. 121, is **GRANTED IN PART AND DENIED IN PART**.  Dr. Kitchens may not testify about whether Dr. Russell Fry breached a duty of care to Davis, but he may testify about the possible causes of Davis's chronic uveitis/iritis.

24

(4)     The motion for partial summary judgment by the United States on Davis's claims related to his treatment on June 27, 2005, R. 119, is **GRANTED**.

(5)     The motion for partial summary judgment by the United States on the grounds that Davis has not presented any expert testimony, R. 118, is **DENIED**.

(6)     The motion for partial summary judgment by Davis on his uveitis/iritis claim, R. 120, is **DENIED**.  Davis may proceed to trial on both his uveritis/iritis and glaucoma claims.  Trial remains scheduled for **May 7, 2012**, at **10:00 a.m.** at the United States Courthouse in **Lexington, Kentucky**.  Counsel shall arrive thirty minutes early.

This the 9th day of February, 2012.

**Signed By:**

*Amul R. Thapar*

**United States District Judge**